THE HONORABLE BARBARA J. ROTHSTEIN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KING COUNTY, a Washington municipal corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE TRAVELERS INDEMNITY CO., *et al.*,<br><br>Defendants. | NO. 14-CV-1957 BJR<br><br>ORDER GRANTING DEFENDANTS LEXINGTON AND NATIONAL UNION'S MOTION FOR SUMMARY JUDGMENT |

## I.   INTRODUCTION

The instant case involves claims by Plaintiff King County against multiple insurers, seeking defense and indemnity related to the County's liability for contamination in and around the Lower Duwamish Waterway located in the City of Seattle. Two such insurers, Defendants Lexington Insurance Company and National Union Insurance Company of Pittsburgh, PA, (collectively, the "AIG Defendants"), have filed this Motion for Summary Judgment, seeking dismissal from this action. They argue that the County's claims against them are barred by a settlement agreement and release King County signed in 1997. Having reviewed the pleadings filed in support of and opposition to this motion, the Court finds and rules as follows.

1

## II. BACKGROUND

In the early and mid 1990s, environmental contamination at multiple sites in the City of Seattle, including around the Lower Duwamish Waterway area at issue in this litigation, was the subject of several lawsuits brought against, among others, the Municipality of Metropolitan Seattle ("Metro"). In response to these lawsuits, Metro tendered claims against its insurers, including the AIG Defendants Lexington and National Union, and several other AIG affiliates. *See* Declaration of Linda Clapham, Dkt. No. 629 ("Clapham Decl."), Ex. 3. Disputes arose over whether, and to what extent, Metro was entitled to coverage. In 1997, in resolution of those disputes, Metro and the "AIG-Related Companies" executed a Settlement Agreement and Release (the "Agreement"), expressing a "wish to (i) avoid litigation, and (ii) fully, finally, completely and in good-faith resolve all disputes and disagreements between them arising from, or connected in any way with, environmental contamination or pollution connected in any way" to the Lower Duwamish Waterway, among other sites. Clapham Decl., Ex. 1, ¶ M. Notably, in 1994 King County and Metro had merged, and it was King County that executed the 1997 Agreement, "as successor to the Municipality of Metropolitan Seattle." *Id*. at p. 1.

In the instant action, which involves some of the same environmental contamination in the Lower Duwamish Waterway, King County is claiming coverage under four AIG excess policies: one issued by National Union to King County (policy number 1225707), and three issued by Lexington to Metro (policy numbers GC 403544, GC 5502773, and 5510602). *See* Clapham Decl., Ex. 2. By this motion, the AIG Defendants claim that the 1997 Agreement was intended to, and did, resolve all of the parties' disputes and disagreements related to contamination at the Lower Duwamish Waterway, known and unknown, current and future, including the instant dispute over these four policies. King County disagrees, arguing that (1) the Agreement does not apply to the National Union policy issued to King County, because the County signed the Agreement "as successor" to Metro, not on its own behalf; that (2) the Agreement does not apply to the three Lexington policies issued to Metro, because the parties

did not intend for the Agreement to apply to Lexington; and (3) the Agreement does not apply to any of the four policies, because it released only certain "enumerated" policies listed in the Agreement, none of the four among them.

For the reasons set forth below, the Court finds that the intent of the parties to the 1997 Agreement, as expressed in the language of the Agreement, was that it be broad enough to include both policies issued to King County and policies issued by Lexington; and, more specifically, the four policies at issue in this action, and therefore grants the AIG Defendants' Motion for Summary Judgment.

### III. DISCUSSION

A. <u>Summary Judgment Standard and Washington Principles of Contract Interpretation</u>

Summary Judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c), *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where there is no dispute of material fact, the construction of a contract is appropriate on summary judgment. *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866 (W.2d 2008); *Brinkerhoff v. Campbell*, 994 P.2d 911, 915 (Wn. App. 2000). Courts interpret settlement agreements using the same principles used in interpretation of other contracts. *McGuire v. Bates*, 234 P.3d 205 (Wn.2d 2010). The parties agree that interpretation of the Agreement at issue in this diversity action is governed by Washington law, and that "[t]he party moving to enforce a settlement agreement carries the burden of proving that there is no genuine dispute over the existence and material terms of the agreement." AIG Defs.' Mot. at 6; King County Opp. at 7, *citing Brinkerhoff*.

In *Berg v. Hudesman*, the seminal Washington case governing the construction of contracts, the Washington Supreme Court directed "every court [to] heed the strong words of Corbin: . . . that language at its best is always a defective and uncertain instrument, that words

3

do not define themselves, that terms and sentences in a contract, a deed, or a will do not apply themselves to external objects and performances." 115 801 P.2d 222, 227 (Wn.2d 1990). Thus, *Berg v. Hudesman* instructs courts to determine the intent of the contracting parties in light of not just the language used, but also "the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." *Id.* With this directive in mind, the Court turns to the Agreement at issue in this motion.

B. The 1997 Agreement Releases Policies Issued to King County.

The 1997 Agreement was executed "by and between (I) King County, as successor to The Municipality of Metropolitan Seattle (together with all related and affiliated entities, 'Metro')" and multiple AIG insurers. Clapham Decl., Ex. 1 at p. 1. King County argues that the qualifier "as successor to" Metro, found several other times in the Agreement, necessarily limits the scope of the Agreement to only those policies issued to Metro, and does not include policies issued to King County itself. *See* Clapham Decl., Ex. 1, § 16(a) (notices to be provided to "King County, as successor to the Municipality of Metropolitan Seattle); p. 12 (Agreement signed by "KING COUNTY, as successor to the Municipality of Metropolitan Seattle"). The County therefore claims that the release in the Agreement does not include the National Union policy under which it claims coverage in this case, which was issued to King County in the 1980s, long before its merger with Metro.

As the AIG Defendants point out, however, King County also executed the Agreement on behalf of "all" of Metro's "related and affiliated entities," a category to which King County undeniably belonged by the time the Agreement was executed. Clapham Decl., Ex. 1 at p. 1. Furthermore, the definition of "policies" released by the Agreement does not articulate the County's proposed limitation. That definition provides "'Policies' is defined as *all policies* issued by National Union . . . with respect to . . . the excess policies *including, but not limited*

*to*, those set forth below." *Id*. ¶ A.(2) (emphases added). Elsewhere in the Agreement, the parties expressed the intent that the "Scope of Releases" not be limited to Metro, but include "all . . . entities that are or purport to be insureds under the AIG-Related Companies Policies." *Id*. § 7(a). In this action, King County is in fact claiming to be an insured under "AIG-Related Companies Policies." *See, e.g.,* Dkt. No. 40 (stipulated Order of Dismissal of King County's claims brought on two "AIG-Related Companies Policies," the American Home primary policies listed in Agreement).

King County argues that the Agreement is limited to policies issued to Metro because the Agreement only resolved then-ongoing disputes between the AIG-Related Companies and Metro. But as noted above, the Agreement was expressly written to include "all . . . entities that are or purport to be insureds under the AIG-Related Companies Policies." Furthermore, parties frequently contract to release future claims, including those not just of themselves, but of successor and assigns; and nothing in the Agreement itself suggests the County's proposed limitation. To the contrary, the Agreement contains a section titled "Explicit Release of Future Claims," providing that a release of "all causes of action, known and unknown, anticipated and unanticipated, past, present and future arising out of, or related in any way to, pollution or contamination at, or emanating from" the sites covered by the Agreement, including the Lower Duwamish Waterway. Clapham Decl., Ex. 1, § 6(a). The Court finds that the intent of the parties, as demonstrated by the language of the Agreement, was to release not just policies issued to Metro, but those issued to King County as well.

C. The 1997 Agreement Releases Policies Issued by Lexington.

King County also argues that the 1997 Agreement did not release claims arising from the three policies issued by Lexington. In support of this position, the County notes that the Agreement was executed between it and "American Home Assurance Company ('American Home'), the Insurance Company of the State of Pennsylvania ('ICSOP'), Granite State Insurance Company ('Granite State'), National Union Fire Insurance Company of Pittsburgh,

5

PA. ('National Union'), and New Hampshire Insurance Company ('New Hampshire'), hereinafter known as the 'AIG-Related Companies,'" and that in fact Lexington is not referenced anywhere by name in the Agreement. Clapham Decl., Ex. 1 at p. 1. *See also* Paragraph A.(2) (defining policies released in the Agreement "as all policies issued by National Union, American Home, ICSOP, Granite State, and New Hampshire").

There is a perfectly logical explanation for why Lexington was not explicitly made a party to the Agreement; King County had tendered claims under policies issued by Lexington, but appears to have acceded to Lexington's denial of coverage several years earlier based upon an "Absolute Pollution Exclusion" clause in the Lexington policies. Clapham Decl., Ex. 7. Nevertheless, it is clear from the extraordinary breadth of the language of the Agreement that the parties intended to include not just the five AIG insurers referenced by name, but "every subsidiary, corporate affiliate or other related entity and all of their respective past, present and future officers, directors, shareholders, trustees, agents, attorneys and employees." Clapham Decl., Ex. 1, § 7(b). There is no dispute that Lexington is a "corporate affiliate" of all the AIG-Related Companies explicitly covered by the Agreement. The Court finds that the intent of the parties to the Agreement was to release not just policies issued by the named AIG-Related Companies, but those issued by Lexington as well.

D. <u>The 1997 Agreement Releases All AIG-Related Companies Excess Policies, Including, But Not Limited to, the 37 Listed in Paragraph A.(2).</u>

Having found that nothing in the Agreement manifests an intent of the parties to exclude policies issued to King County, or policies issued by Lexington, and that to the contrary, the Agreement is broadly written to include such policies, the Court turns to King County's final argument: that the release language itself does not include any of the policies at issue in this case.

The 1997 Agreement contains two release provisions. Only one of those provisions, Section 3(a), is at issue in this motion. Section 3(a) releases all of Metro's claims under excess

policies issued by several "AIG-Related Companies," defined elsewhere in the agreement as "American Home Assurance Company, the Insurance Company of the State of Pennsylvania, Granite State Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, and New Hampshire Insurance Company," and construed by the Court, as discussed above, to also include Lexington. Specifically, Section 3(a) provides:

> With respect to the AIG-Related Excess Policies as enumerated in Paragraph A.(2), (excess and umbrella policies, hereinafter collectively referred to as "Excess Policies"), Metro hereby fully, finally and completely releases and discharges AIG-Related Companies and all employees, agents, attorneys, shareholders, officers, and directors thereof, from all Claims under the excess policies (including claims asserting a duty to defend or a duty to indemnify) and causes of action, known and unknown, anticipated and unanticipated, past, present and future arising out of, or related in any way to, pollution or contamination at, or emanating from . . . the Duwamish River . . .

Clapham Decl., Ex. 1. Paragraph A.(2), contained in the Recitals, in turn provides, in relevant part, that "'Policies' is defined as all policies issued by National Union, American Home, ICSOP, Granite State, and New Hampshire, with respect to . . . the excess policies including, but not limited to, those set forth below." *Id*. The Agreement then lists 37 excess policies issued by those five insurers.

King County claims that this release applies to, and only to, the 37 excess policies specifically listed in Paragraph A.(2), and that because the four policies at issue in this case are not among those listed, they are not covered by the release. The County focuses on the parties' choice of the word "enumerated" in Section 3(a), arguing that it signals an intent to limit the release to just those 37 policies "explicitly named" in Paragraph A.(2), and no others.

The problem with the County's unnecessarily narrow definition of "enumerated" is that it renders the phrase "including, but not limited to" in Paragraph A.(2)—as in "including, but not limited to" the 37 policies—superfluous. Such constructions are disfavored in Washington, and "a court should not disregard language that the parties have used." *Snohomish Cty. Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc.*, 271 P.3d 850, 856 (Wn.2d 2012), *citing*

*Wagner v. Wagner*, 621 P.2d 1279 (Wn.2d 1980); *see also Ley v. Clark Cty. Pub. Transportation Benefit Area*, 386 P.3d 1128, 1136 (Wn. App. 2016) (courts should interpret "contracts to give effect to all the language used and without rendering any portion meaningless."). The County fails to suggest any other purpose for which this phrase would have been intended, other than to ensure that the release was *not* limited to just those 37 policies.

The County's reading also is contrary to every other indication in the Agreement that the parties intended the broadest possible reach of the bargained-for releases. Throughout the Agreement, again and again, the parties expressed an intent to provide the broadest releases possible. *See, e.g.*, Clapham Decl., Ex. 1, § 6 ("it is the intention of Metro to hereby fully, finally and completely settle all matters described in Section 2 and 3 regarding said policy claims, known or unknown, suspected or unsuspected which now exist, may in the future exist, or heretofore exist between Metro and AIG-Related Companies."); *Id*. § 2, (releasing American Home primary policies (not at issue in this motion), stating release is "intended and shall be construed as a release for events arising on or after the beginning of the earth until the end of time"); *Id*. ¶ M (expressing parties' wish "to fully, finally, completely and in good-faith resolve all disputes and disagreements between them"). Indeed, Section 3(b) refers explicitly to the "generality of the foregoing releases," a characterization that makes no sense in the context of King County's proposed restrictive interpretation.

The reading the AIG Defendants espouse does not seek to "broaden the express terms of the release," as King County claims; but the various expansive provisions of the Agreement do shed light on the Agreement's ambiguous and at times, divergent terms. Mindful of the admonitions of *Berg v. Hudesman*, in the context of the contract as a whole, the Court finds that the intent of the parties was that the Section 3(a) release should include, but not be limited

to, the 37 listed policies. As discussed *supra*, therefore, that release would include all four AIG policies at issue in this case.[1]

E. <u>King County Has Failed to Demonstrate It Is Entitled to Continuation of this Motion</u>

Finally, King County seeks relief under Fed. R. Civ. P. 56(d). That rule authorizes a court to deny or defer consideration of a motion "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," and for the court to "allow time to . . . take discovery." To avail itself of this rule, a party must show "(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). King County avers that "[t]he current situation provides a clear case for application" of this rule. Other than the complaint that the AIG Defendants have refused to produce a Fed. R. Civ. P. 30(b)(6) witness for a deposition the County noticed in September 2016, however, the County fails to provide any support for this request. The County does not explain why it has not sought an order compelling production of the 30(b)(6) witness, or, more critically, what information it would hope to discover, let alone how such information is "essential to" its opposition to this motion. Indeed, the parties appear to agree that construction of the Agreement is appropriate without resort to parol evidence. In the absence of any "specified reasons [the County] cannot present facts essential to justify its opposition," the Court denies the County's request for denial or continuance of this motion on 56(d) grounds.

---

[1] The AIG Defendants move in the alternative for dismissal of King County's coverage claims under the Lexington policies, claiming that the statute of limitations for claims on those policies has run. Because the Court dismisses Lexington from this action on the foregoing grounds, it need not, and does not, reach this argument.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the AIG Defendants' Motion for Summary Judgment. Defendants National Union and Lexington are hereby DISMISSED from this action.

Signed this 11th day of June, 2018.

Barbara Jacobs Rothstein
U.S. District Court Judge